

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0736-17

## JOHN KENNETH LEE, Appellant

### v.

## THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRTEENTH COURT OF APPEALS
### VICTORIA COUNTY

**YEARY, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

The Thirteenth Court of Appeals reversed Appellant's conviction for misdemeanor

driving while intoxicated. *Lee v. State*, No. 13-15-00514-CR, 2017 WL 2608304 (Tex.

App.—Corpus Christi June 15, 2017) (mem. op., not designated for publication). The court

of appeals held that the trial court abused its discretion in failing to grant his motion for

mistrial. *Id*. at *7. We granted the State's petition for discretionary review in order to address

its contentions that (1) Appellant failed to preserve error, and that, (2) in any event, any

potential harm could have been forestalled by a curative instruction, which Appellant failed

at any time to request before asking for a mistrial. We reverse the judgment of the court of appeals.

## I. THE TRIAL

### A. The Information, Voir Dire, and Opening Statements

The information alleged that, on October 11, 2013, Appellant operated a motor vehicle in a public place while intoxicated, a Class B misdemeanor.[1] It did not allege the particular theory of intoxication: whether by loss of normal mental or physical faculties by reason of the ingestion of a substance such as alcohol, or else by having an alcohol concentration of .08 or more.[2] Immediately before jury selection, the prosecutor announced on the record that he had just discovered that "the City of Victoria has destroyed the blood sample prior to trial." Appellant's trial counsel acknowledged on the record that she heard and understood the prosecutor's announcement, but she expressly declined the trial court's invitation to request a motion in limine. The prosecutor devoted a portion of his half-hour voir dire to asking the veniremembers whether they would be able to convict a defendant based upon evidence of his loss of mental or physical faculties alone, in the absence of blood-alcohol-concentration (BAC) evidence.

Trial began the next morning. In his opening statement, the prosecutor described the

---

[1] TEX. PENAL CODE § 49.04(a) & (b).

[2] TEX. PENAL CODE § 49.01(2). In *State v. Barbernell*, 257 S.W.3d 248, 256 (Tex. Crim. App. 2008), we held "that the definitions of 'intoxicated' in Section 49.01(2) are evidentiary and therefore do not need to be alleged in a charging instrument."

evidence he intended to present to show that Appellant had lost his normal mental and physical faculties. But toward the end, he also explained what he believed the evidence would show with respect to Appellant's BAC:

> [Appellant was] transported to the hospital, and eventually a blood draw was taken. There were actually two blood draws, but the state, they tested one blood draw when it was sent to the lab. You will hear testimony from the phlebotomist who actually took the blood draw at Citizens Medical Center, and the lab technician who tested this blood sample from the Department of Public Safety in the Weslaco lab in Weslaco, Texas, and determined that the blood alcohol content was .169. Ladies and gentlemen, the -- as we reviewed to you in voir dire, the legal definition of intoxicated, that is over double the legal limit. You will hear testimony to that effect.

Appellant's counsel made no objection to this argument. In her own opening statement, she first described what she believed the evidence would show regarding Appellant's mental and physical faculties. Then, as did the prosecutor, she turned to the BAC evidence:

> Now, the state has said that they have blood evidence, and I was informed yesterday that they do not have blood evidence. They're going to -- they have told you that they're going to bring a phlebotomist in here and she'll testify. She'll be testifying without any blood because that blood evidence is not here. They'll attempt to bring in, according to them a chemist to testify about blood that he possibly tested, but they don't have the blood to show you. They have nothing more than someone's word about blood they tested. This chemist does this for a living at DPS. He does possibly hundreds of tests a day. So he'll be having to testify from his own personal recognition or what he remembers of this one blood sample, if he gets to testify. So I want you to keep that as well, there is no blood in this case, so all the evidence has to do with blood, the things they're claiming they're going to show you, I don't believe they'll be able to show you. I don't believe the state will be able to prove this case beyond a reasonable doubt. Thank you.

Appellant's counsel apparently made a tactical decision not to object to the prosecutor's opening remarks about the BAC evidence, although she had known since the previous

afternoon that the blood had been inadvertently destroyed. She did not attempt to suppress the evidence or subject it to a motion in limine. Instead, she responded to the prosecutor's opening allusion to the BAC evidence in her own opening statement, telling the jury that she did *not* expect there to be evidence of Appellant's BAC, notwithstanding the prosecutor's opening statement.

### B. Evidence Relating to Appellant's Loss of Mental and Physical Faculties

The guilt-phase evidence showed that, shortly after 10:00 p.m. on October 11, 2013, Appellant's truck rear-ended another truck that was idling at a red light, pushing that truck into the intersection and injuring its driver's back. Two witnesses to the collision described Appellant, when he got out of his truck, as smelling of alcohol. Each of them confirmed that the smell "was pretty strong." Responding officers also noticed the smell, as well as the fact that Appellant had glassy, bloodshot eyes and slurred speech. Appellant was subjected to field sobriety testing, which revealed "all six clues" of intoxication on the horizontal gaze nystagmus test and five signs of intoxication on the heel-to-toe test. The jury watched a video of the field sobriety tests. Appellant told the officers that, during the course of the evening, he had consumed at least six "O'Douls," a non-alcoholic beverage. However, a half-full bottle of Crown Royal (a blended Canadian whiskey) was found in the passenger compartment of Appellant's truck.

### C. Evidence Relating to Blood Draws

Almost half of Appellant's one-day trial involved the development of the State's

blood-draw evidence. Evidence showed that Appellant refused to submit to either a breath or blood test. Nevertheless, because the collision involved an injury, he was taken to Citizens Medical Center for a blood draw, pursuant to statute.[3] A consulting prosecutor suggested to the police officers that they obtain a search warrant for Appellant's blood, which they did, and a second blood sample was drawn.[4] During the latter stages of Appellant's one-day trial, the State attempted to develop a chain of custody for the BAC evidence.

In this regard, the jury heard that Officer J. J. Houlton of the Victoria Police Department transported Appellant to the hospital for a blood draw. Houlton explained to Appellant that, because there was an accident involving an injury, he was required by law to submit to the blood test. Houlton was present when the phlebotomist, Beatrice Salazar, conducted both blood draws. Salazar drew the first vial at 11:15 p.m., on October 11th; and, after a warrant was obtained, she drew the second vial at 2:30 a.m., on October 12th. Houlton initialed the labels for the vials, placed them in a box, sealed the box with evidence tape, and submitted it to the evidence locker. Appellant did not object to Houlton's testimony.

The State next called Salazar to the witness stand. Before Salazar gave any substantive testimony, Appellant's counsel objected for the first time, arguing that, in the absence of the

---

[3] *See* TEX. TRANSP. CODE § 724.012(b)(1)(C) (requiring police officers to take a blood or breath specimen from a person arrested for driving while intoxicated if he causes an accident in which an individual has been injured and taken to a hospital).

[4] This prosecutor may well have had in mind the case pending in the Thirteenth Court of Appeals at that time in *State v. Villarreal*, 476 S.W.3d 45 (Tex. App.—Corpus Christi 2014), which this Court eventually affirmed in *State v. Villarreal*, 475 S.W.3d 784 (Tex. Crim. App. 2014).

blood vials themselves, Salazar should not be allowed to testify about the blood draw. The prosecutor replied that Salazar was not the witness who would be testifying about the *results* of the blood test. He claimed that he was only calling her to establish the chain of custody. The trial court assured Appellant's counsel that "I understand what your objection is, but I'm going to give [the prosecutor] leeway to see what is there." Salazar was allowed to testify to the jury that she took both blood samples from Appellant, though she was unable to recognize him in the courtroom. Appellant again objected that Salazar should not be allowed to testify "past this point." The trial court overruled this objection too. Salazar was then permitted to testify before the jury that she had handed the blood vials over to "the police officer, and they [took] it from there." She confirmed that she had watched Houlton label the blood and place it in the evidence box.

Lastly, the State called to the stand an analyst from the Weslaco lab of the Texas Department of Public Safety (DPS), named Gene Hanson. The jury heard nothing more than Hanson's credentials, however, because Appellant objected as soon as the prosecutor asked Hanson whether he had received a vial of blood with Appellant's name on the label. The jury was then excused.

Outside the presence of the jury, Appellant argued that, in the absence of the blood vials and accompanying documentation, the State would simply be unable to establish a chain of custody, and the results of the blood testing would be inadmissible. Appellant argued that, because the prosecutor had informed the jury of the test results during his opening statement,

the jury had been prejudiced and a mistrial was appropriate. When the trial court pointed out

that Appellant had declined its invitation to request a motion in limine, Appellant's counsel

responded:

> But if they cannot prove up something they stated in their opening that was highly prejudicial, I am entitled to a mistrial in that case, Judge -- in this case, Judge. Because just as I told the jury, I knew that they had no blood, but I did not know that they were going to make this claim in their opening, and then leave me to try to explain to the Court why this gentleman [Hanson] cannot testify in front of a jury.[5]

The prosecutor answered that a break in the chain of custody merely impacts the weight of

the evidence, but not its admissibility. He pointed out that, in the two years since the date of

the offense, the defense had never requested to inspect the blood evidence. Appellant's

counsel insisted that she had no interest in re-testing the blood; that her only concern was

with the chain of custody. She contended, moreover, that "there has not been a simple breach

in the . . . chain of custody. There has been a total loss of evidence." She argued that an

instruction to disregard would not suffice to remove the BAC information from the minds

of the jurors. "So, yes," she concluded, "I am asking for a mistrial."

---

[5] A little later, Appellant's counsel asserted that, without the blood,

> . . . I could have filed a Motion to Suppress. I did not do that because I thought that the blood was here. I have never been advised that it was destroyed. The -- Evidently the state in their statement yesterday just found out yesterday at noon that they had no blood, so my opportunity to file that Motion to Suppress was denied. So today I have to handle this in the trial. So I am asking the Court to disallow the blood evidence, and grant a mistrial.

She never explained why she had not sought a motion in limine, even though the trial court had expressly invited her to do so.

The trial court asked the prosecutor, "[H]ow do we know that this blood came from the defendant?" The prosecutor replied that he intended to establish a sufficient chain of custody by having Hanson confirm from his case notes that the blood he tested was labeled with "the agency number" and "the full name, John Kenneth Lee, the date of birth, Texas driver's license number, we have all of that." The trial court then allowed the prosecutor to voir dire Hanson in an attempt to elicit that information.

Hanson testified outside the jury's presence that he received "one blood tube" for analysis under Appellant's name, but did not recall ever receiving a second one. The blood vial was first sent to the DPS lab in Corpus Christi, but because that lab had a backlog, it was forwarded to the Weslaco lab. From his case notes, Hanson verified "that the name of the submission forms actually matches on the -- on the blood tube[,]" and that "the laboratory case number, in this case . . . is the same case number that's on the actual DPS blood tube kit box." Based on this representation, the trial court allowed Hanson to testify before the jury, but cautioned the prosecutor to approach the bench before eliciting the blood test results.

When the jury returned, Hanson testified again about the chain of custody. From his case notes and lab report, he was able to remember that he had received a sealed vial of blood indicating that it had been drawn from "John Kenneth Lee," bearing an agency number for the Victoria Police Department, for an unspecified offense that occurred on October 11, 2013. He next described for the jury in some detail how he would typically go about testing blood for its alcohol concentration level. Pursuant to the trial court's instructions, the

prosecutor approached the bench before attempting to elicit the test results. The jury was again excused, and Appellant's counsel renewed her objection regarding chain of custody.

For the first time, Appellant's counsel pointed out that, without a proper chain of custody, she could not even determine whether the blood that Hanson tested had come from the first blood draw, taken pursuant to statute, or from the second blood draw, taken pursuant to a warrant. "So I can't hardly even argue that the one they sent was the later one, which would show, as the officer testified earlier, that it's going to be higher than the other one because of the time lapse. I don't know when they drew the blood, I can't even argue that."[6] At this point, the trial court sustained Appellant's objection and ruled the BAC evidence inadmissible.

Appellant's counsel did not immediately lodge another request for a mistrial. At no point did she move to strike the prior testimony regarding the blood draws, nor did she ever ask the trial court to instruct the jury to disregard it. And at no point during the course of the trial did she ever ask the trial court to instruct the jury to disregard the prosecutor's assertion in his opening statement that Appellant's BAC had tested at .169.

---

[6] The "officer [who] testified earlier" was patrol officer Jason Sager, one of the officers who responded to the accident scene and the one who administered the horizontal gaze nystagmus test. He was also present when the second blood draw was taken. Under questioning from Appellant's counsel in the jury's presence, he testified that it is sometimes advantageous to take two blood samples because "it can show whether the alcohol BAC is on the rise or on -- or whether it's dropping between the two samples." He elaborated that, if the second blood sample shows a higher blood alcohol level than the first, it could indicate that the blood alcohol concentration is on the rise, suggesting that the person may not have had a greater than .08 concentration while driving.

**Mistrial Request, Jury Charge, and Final Argument**

Both parties rested and closed, without any further testimony from Hanson. The jury was excused so that the jury charge could be finalized, and only then did Appellant's counsel renew her request for a mistrial:

> THE COURT: Then [Defense Counsel], you did say that you had another objection or something that you wanted to take up prior to bringing the jury back in?
>
> [DEFENSE COUNSEL]: Yes, Judge, I just want to reurge my earlier objection to the statements -- comments that they made in opening statement. I believe that they were very egregious. I believe this jury has been tainted, that they're going to have a very difficult time even with these instructions and the instructions from the Court forgetting that opening statement about the blood alcohol level of .169. I believe that they'll remember that and I believe they will use that in their considerations, and I am asking to Court for a mistrial.

The trial court denied this request.

The trial court's charge to the jury defined intoxication only in terms of "not having the normal use of one's mental or physical faculties by reason of the introduction of alcohol . . . into the body." The charge made no mention of BAC as a theory of intoxication. The jury was also instructed that "[t]he lawyers' arguments or statements are not evidence and not to be considered by you in your determination of the disputed facts in the case."

During his final argument, the prosecutor made no mention of the blood-draw testimony or the result of the blood analysis. He instead emphasized the evidence showing that Appellant lacked the normal use of his mental and physical faculties, such as the prevalent odor of alcohol, the half-full liquor bottle, Appellant's refusal to voluntarily submit

a blood or breath specimen, and the results of the field sobriety tests as memorialized on the video. For her part, Appellant's counsel reminded the jury that the State had promised to produce evidence of his blood alcohol concentration but had not fulfilled that promise. She urged the jury to consider the video, arguing that it failed to establish intoxication. She summed up by emphasizing the importance of considering only the evidence presented:

> But the one thing that I want to do with you today is make sure that you consider only what you heard from here and whatever physical evidence that you have. I don't want you to consider anything that you have heard in this courtroom other than that evidence, please. Thank you.

The prosecutor closed by reiterating that the evidence showed loss of normal mental and physical faculties—again, making no allusion to the blood-draw evidence or Appellant's BAC. After final arguments, the jury convicted Appellant in fifteen minutes, and later assessed a sentence of 180 days in jail and a fine of $1,800.

## II. THE APPEAL

In his sole point of error on direct appeal, Appellant argued that the trial court abused its discretion in denying his request for a mistrial "after the State disclosed the results of the blood test in opening statements and examined three separate witnesses regarding the blood evidence."[7] The court of appeals agreed. While noting that Appellant had not objected to the prosecutor's opening statement, the court of appeals nonetheless found it to be error. *Lee*, 2017 WL 2608304, at *4-5. In the absence of a proper chain of custody, the court of appeals held, the State could not exclude the possibility that the blood that Hanson analyzed for BAC

---

[7] Appellant's Brief on Direct Appeal at 11.

came from the initial blood draw. *Id*. In the court of appeals' view, the State should have known that this warrantless blood draw was illegal, and that any BAC testimony was therefore inadmissible, under this Court's opinion in *State v. Villarreal*, 475 S.W.3d 784, 814 (Tex. Crim. App. 2014), which was pending on rehearing at the time of Appellant's trial. *Lee*, 2017 WL 2608304, at *4-5. This initial error was magnified, the court of appeals observed, by the testimony of the three witnesses describing the blood draws and the BAC testing protocol, which was introduced over Appellant's objections and requests for mistrial. *Id*. at *5. Conducting an analysis under the three-factor test for abuse of discretion in *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004),[8] the court of appeals concluded that the trial court abused its discretion in failing to grant Appellant's ultimate motion for mistrial, and it reversed the conviction and remanded the cause for a new trial. *Lee*, 2017 WL 2608304, at *5-7.

## III. ANALYSIS

In its petition for discretionary review, the State argues that the court of appeals erred to conclude that Appellant preserved any error for appeal. First, the State argues, the prosecutor's opening statement was not erroneous, since it is only proper for the parties to state what they expect the evidence to show at that juncture. Second, by failing to object to

---

[8] Under *Hawkins v. State*, we adopted a three-factor approach for measuring abuse of discretion in failing to grant a mistrial, which balanced: (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of the punishment (likelihood of the conviction absent the misconduct). 135 S.W.3d at 77 (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)).

the prosecutor's opening statement, the State maintains, Appellant forfeited any complaint on appeal about the prejudice it may have caused when the evidence later proved inadmissible. And finally, the State argues that an instruction to disregard the prosecutor's allusion to BAC evidence and the testimony about the blood draw would have been efficacious, and that Appellant's failure to request one also served to forfeit error on appeal.

Because we agree with the State's third argument, we need not address its first two. We conclude that an instruction to disregard would have served to obviate any harm in the jury's having been exposed to the remaining objectionable blood-draw testimony. For this reason, the court of appeals should not have proceeded to conduct a *Hawkins* mistrial analysis.

The State argues that, before Appellant can complain on appeal that the trial court denied his request for a mistrial, he must first have sought a curative instruction. This is so, the State maintains, because "an event that could have been . . . cured by instruction to the jury will not lead an appellate court to reverse a judgment on an appeal by the party who did not request [the lesser remedy] in the trial court." *Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004). We agree that if a curative instruction would have sufficed, it cannot be said that the trial court abused its discretion to deny Appellant's final mistrial request. *See Ocon v. State*, 284 S.W.3d 880, 885 (Tex. Crim. App. 2009) ("Though requesting lesser remedies is not a prerequisite to a motion for mistrial, when the movant does not request a lesser remedy, we will not reverse the court's judgment if the problem could have been cured

by the less drastic alternative.").

Even assuming that it was appropriate for the court of appeals to factor the prosecutor's allusion during his opening statement to the BAC test results into our analysis of whether a curative instruction would have been efficacious, we conclude that a mistrial was unnecessary. The jury was instructed in the jury charge that the arguments and statements of the lawyers were not in evidence and therefore "not to be considered . . . in your determination of the disputed facts in the case." Had Appellant supplemented this boiler-plate instruction by requesting an instruction to disregard that specifically admonished the jury to discount all of the blood evidence, including the prosecutor's opening statement allusion to the BAC test result, the two instructions combined would have made a strong impression. The evidence establishing driving while intoxicated under the theory that Appellant had lost the normal use of his mental and physical faculties was fairly compelling, and the jurors had given assurances during voir dire that they could convict a defendant on that theory of the offense without the necessity of BAC evidence. Under these circumstances, there is no persuasive reason to doubt that these curative instructions would have been efficacious. Because a jury instruction to disregard would have obviated the necessity of a mistrial, the court of appeals erred to conclude that a mistrial was the only appropriate remedy. *Young*, 137 S.W.3d at 70.

## IV. CONCLUSION

Because an instruction to disregard the blood-draw testimony, including an

admonishment not to consider the prosecutor's opening statement assertion about the result of the BAC testing, would have been efficacious, Appellant should not have been heard to complain on appeal of the trial court's failure to grant his motion for mistrial. For this reason, the court of appeals should not have proceeded to its analysis of whether the trial court abused its discretion to deny the motion for mistrial under the *Hawkins* factors.

We reverse the judgment of the court of appeals.


DELIVERED:   June 13, 2018
PUBLISH