

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| GUSTAVO VALENCIA, | | No. 08-16-00165-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 168th District Court |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 20140D05521) |
| | § | |

# **O P I N I O N**

A jury convicted Appellant of murder, resulting in a sixty-year prison term. His appeal challenges (1) the failure to submit a jury charge on the lesser included offense of manslaughter, and (2) the failure to strike testimony or grant a mistrial based on witnesses violating TEX.R.EVID. 614 and TEX.CODE CRIM.PROC.ANN. art. 36.06 (West 2007)(collectively, and more commonly referred to as the "Rule"). We affirm.

## FACTUAL BACKGROUND

This case arises from an after-school fight, but not the kind of fist-a-cuffs that result in a bloody nose. Rather, Appellant and his friend took semi-automatic pistols to the fight, and by the end of the fray, an unarmed Aaron Ochoa had been shot ten times, with six of the wounds capable of having caused his death.

## Appellant's Version of Events

Appellant was friends with Miguel Bygotia. Appellant attended El Paso High School and Bygotia attended nearby Paso Del Norte Academy. On October 30, 2014, Bygotia got into a dispute with one his classmates, Aaron Ochoa, and the two agreed to meet after school. While he was still at school, Appellant began receiving phone calls and texts from Bygotia. One text asked Appellant to retrieve two handguns from Bygotia's house. Appellant ignored the text and Bygotia's several phone calls.

After the school day ended, however, Appellant ran into Bygotia who was waiting for him. According to Appellant, Bygotia asked him to help "scare a guy." Appellant claims that he agreed to go with Bygotia so long as scaring the person was all Bygotia was going to do. Scaring, however, apparently included brandishing guns. Bygotia owned two semi-automatic pistols: a .380 Bersa and a 9mm Glock. Appellant put the .380 Bersa into his waist band, and Bygotia took the 9mm Glock.

The two walked to a parking lot near Bygotia's school. On the way, Appellant claims that Bygotia repeatedly assured him that he was just going to scare the person. Appellant did not know the person, nor the nature of the dispute. No one was at the parking lot when they arrived. Bygotia received a phone call and spoke the words "parking lot" to whomever had called. Two other friends, Armando Torres, and Jesse Sandoval, arrived shortly in Torres's SUV.

Details of the shooting sharply diverge at this point. Appellant's version, presented largely through his own testimony, recounted that Ochoa along with a group of his friends walked onto the parking lot. Ochoa was accompanied by a girl, Enid Hernandez, and another unidentified male who had a scar on his forehead. Bygotia walked towards Ochoa to confront him. Appellant claims he stayed some distance away and was behind Bygotia.[1] Ochoa began taking off his ear rings and

---

[1] The position of where each person stood is difficult to decipher from the written record. Witnesses would use a

2

gave his books to Enid Hernandez. Bygotia and Ochoa began to argue. Appellant did not hear the conversation, but he saw that Ochoa looked angry. Appellant recalled that the scar-faced male with Ochoa started moving off and around him.

Appellant then claimed that Ochoa said loudly in Spanish, "Turnala pues," which he translated to mean "shoot it then." He claimed Ochoa was at the same time opening up his hand. Appellant claims that he became concerned, thinking Ochoa was telling someone "to shoot at us." He looked to the left and saw the scar-faced male still walking, and then heard gunshots to his right. He saw Ochoa reached to his left pocket with his right hand. Appellant claimed to panic and grasped the .380 Bersa. He then "just put my hand to the side with the gun facing the floor. And before I started shooting, I close my eyes and I shot as fast as I could" until the gun would fire no more. But according to Appellant, "Every time I was shooting, it kept my hand moving up and up and up until it stopped. And when it stopped I open my eyes and I realized that [Ochoa] is on the floor." He claimed he only wanted to "make some noise with the gun" so whoever was shooting would think "Oh, they have guns," and "maybe they will stop, you know." At trial, he flatly claims that he never shot Ochoa.

After he emptied his gun, Appellant followed Jesse Sandoval back to Armando Torres's truck, as did Bygotia. They fled the parking lot, and while in the vehicle, Bygotia said, "Bro, I miss his head." Sandoval dropped Appellant and Bygotia off at Bygotia's house. Bygotia collected the .380 Bersa from Appellant, as well as Appellant's shirt and pants.

### The State's Case

The State presented a different view of the shooting. Notably, much of its version came through Appellant's statement to the police. Detectives quickly learned the identity of Bygotia

---

pointer and scene diagram to indicate where people stood, but on the written record, all we know is that someone stood "here" without knowing where "here" happens to be. Distances were approximated through equivalent landmarks in the courtroom that were not translated to feet or yard measurements.

and Appellant and arrested both the morning after the shooting. Appellant gave a recorded statement soon after his arrest. In the statement, Appellant repeats that Bygotia just intending to scare Ochoa. Each took one of the guns, and went to the parking lot to wait for Ochoa. When Ochoa arrived, he started to prepare for a fist fight, but Bygotia pulled out the gun. According to Appellant's statement, "At the last moment, when the other guy told him to shoot him, he did." Appellant unequivocally stated that he began to shoot Ochoa after Bygotia opened fire: "He shot him first and then I shot him, too and we just left." Appellant said he did not know why Bygotia opened fire. When asked why he shot, Appellant said "I don't know, sir. I think 'cause I had his back." Nothing in the statement claims that Appellant (1) was just firing into the ground, (2) he fired just to scare someone, (3) there was scar-faced man who walked behind him, or (4) Ochoa was reaching for something. At trial Appellant attempted to discredit his police statement, by claiming it was coerced. The jury charge provided instructions for the jury to evaluate that claim.

The State also presented several eyewitnesses to the shooting. Enid Hernandez walked with Ochoa to his car in parking lot. As they approached Bygotia and Appellant, Ochoa handed his things to her which she started to put in his car. As she did, she heard Ochoa say, "If you're going to shoot, go ahead and shoot." She heard gunshots from two guns. Another witness, Jason Cagann was getting into his car in the parking lot and heard what sounded like firecrackers. He looked around and saw Ochoa fall to the ground; the single shooter that he saw continued to shoot him four or five times.

Yvette Rivera also parked in that lot. As she went to her car, she saw two boys standing near her car who looked nervous, As she was about to turn out of the parking lot, she heard shots, and saw Ochoa shot six to seven times. According to Rivera, both boys were shooting Ochoa. In her police statement, she said the shorter of the boys fired once and ran towards a vehicle, the taller one stayed and kept shooting. She could not identify the boys, however, in a photo line-up.

4

Vanessa Ruiz, a school principal, happened to be driving by the parking lot at the time of the shooting. She noticed a large group of students from Del Norte Academy, and then saw two young men pull guns and start shooting another youth. One shooter was holding his gun straight forward. The other shooter, who she identified at trial as Appellant, was holding his gun "sideways." Her police statement, however, said she only saw one shooter.

Jesse Sandoval, who was friends with Bygotia, accompanied Armando Torres to pick-up Bygotia after school. According to his testimony, they arrived in the parking lot just after 5:00 pm. Sandoval exited the vehicle and walked towards Bygotia and Appellant. As he approached, he saw Ochoa come onto the lot and Bygotia and Ochoa began to argue. Bygotia and Ochoa were five to six feet apart, and Appellant was further back. As Ochoa prepared to fight, Bygotia pulled out a gun. Ochoa said, "If you're going to shoot me, just shoot me." Bygotia started to shoot and then Appellant did as well. Sandoval, however, believed that Bygotia was shooting at Ochoa and Appellant was shooting at the ground. He recalled that Appellant had a look of "terror" on his face. Bygotia kept shooting even after Ochoa fell to the ground.

### The Physical Evidence

Ochoa was found face down when first responders arrived at the scene. He was not breathing and had no heartbeat. Efforts to resuscitate him were unsuccessful. The coroner identified ten distinct bullet tracks in his body. Six were to the torso, three to the upper extremities, and one to the lower extremity (one wound to the hand might have overlapped with one of the other bullet tracks). Most of the bullet tracks were through and through and no slug was ever recovered. However, three intact slugs and the fragment of a fourth were found in the body. Taking the testimony of the coroner and a DPS forensic scientist testimony together, two slugs recovered from two of the torso wounds came from the 9mm Glock (Bygotia's gun). One slug was recovered from behind the knee and was identified as a .380 round (the gun that Appellant

5

was using).  That slug entered the front of the thigh, shattered the femur, and lodged behind the knee cap.  Another slug fragment found in the body could not be identified as either a .380 or 9mm round.  The coroner concluded that five of the torso wounds, and the .380 wound to the thigh were all potentially life threatening.[2]

The police recovered both guns from a vehicle outside of Bygotia's house.  The .380 Bersa could have held seven rounds in the clip, and one in the chamber for a total of eight potential rounds.  The 9mm Glock could have held 17 rounds in the clip, and one additional round in the chamber.  At the crime scene, the police found four unspent 9mm rounds (a round being the entire bullet).[3]  They found six 9mm and seven .380 shell casings.  The police determined that all the shell casings came from the respective Bersa and Glock guns.

### Procedural Background

Appellant was indicted for murder, alleged in two distinct ways.  The State claimed Appellant intentionally or knowingly caused Ochoa's death by shooting him with a firearm.  The State also alleged that Appellant, with intent to cause serious bodily injury to Ochoa, committed an act "clearly dangerous to human life" that caused his death.  The State contended that Appellant was liable as a primary actor, and additionally responsible for Bygotia's actions because Appellant solicited, encouraged, directed, aided or attempted to aide Bygotia to commit the offense of murder.

At the outset of the jury trial, and upon the request of the State, the trial court invoked "the rule."  Consistent with TEX.CODE CRIM.PROC.ANN. art. 36.06 (West 2007), the trial court instructed the witnesses that:

---

[2] Appellant presented expert testimony contesting whether the thigh wound was indeed life threatening.

[3] And as we will explain later, there was some testimony that three .380 unspent rounds were supposedly found at the scene.

6

You're ordered to leave the courtroom and not reenter unless instructed to do so by the bailiff or me. You are not to discuss this case or your testimony with other witnesses or anyone else except the attorneys. You're not to read any report of or comment on the testimony or evidence in the case. Any witness violating this instruction is subject to being held in contempt of court.

As we explain in more detail below, when one of the investigating detectives was recalled in Appellant's case in chief, the detective revealed that several of the detectives had met during the trial to discuss the case. The trial court recessed the trial to allow Appellant to investigate the matter. The trial court further conducted a mid-trial hearing on the matter, but denied Appellant's motion for mistrial.

Appellant raised the issue of self-defense beginning in both voir dire and opening argument. The trial court included instructions on self-defense in the charge. At the charge conference, however, Appellant objected to the jury charge because it lacked a submission on the lesser-included offense of manslaughter.

The jury found Appellant guilty of murder, and following the punishment phase, assessed a sixty-year sentence. Appellant raises two issues for our review. He first claims that the trial court erred in refusing to include instructions on the lesser-included offense of manslaughter. Next, he claims the trial court erred in refusing to strike testimony, or grant a mistrial, based on several police detectives violating the witness sequestration rule. We take each issue in turn.

## LESSER INCLUDED OFFENSE

In his first issue, Appellant contends the trial court erred in refusing to submit his requested lesser-included instruction on manslaughter.

### Standard of Review and Applicable law

We conduct a two-step *Aguilar/Rousseau* analysis to determine whether the trial court should have given the jury a lesser-included offense instruction. *State v. Meru*, 414 S.W.3d 159, 162 (Tex.Crim.App. 2013); *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex.Crim.App. 2012); *Knott*

7

*v. State*, 513 S.W.3d 779, 791-92 (Tex.App.--El Paso 2017, pet. ref'd).  First, we must determine as a matter of law whether the requested instruction is indeed a lesser-included offense of the offense charged.  *Meru*, 414 S.W.3d at 162; *Cavazos*, 382 S.W.3d at 382; *Hall v. State*, 225 S.W.3d 524, 535 (Tex.Crim.App. 2007).  To do this, we compare the elements of the offense as alleged in the indictment with those of the requested lesser offense.  *Meru*, 414 S.W.3d at 162.  Under this approach, an offense is a lesser-included offense of the charged offense if the indictment alleges all the elements of the lesser offense, or if the indictment alleges elements plus facts from which all the elements of the lesser offense may be deduced.  *See McKithan v. State*, 324 S.W.3d 582, 587 (Tex.Crim.App. 2010).  This is a question of law independent of the evidence produced at trial.  *Rice v. State*, 333 S.W.3d 140, 144 (Tex.Crim.App. 2011); *see also Meru*, 414 S.W.3d at 162.

Second, as a question of fact, we must determine whether there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser offense.  *See Meru*, 414 S.W.3d at 162-63, *citing Hall*, 225 S.W.3d at 536; *Guzman v. State*, 188 S.W.3d 185, 188-89 (Tex.Crim.App. 2006).  "[A]nything more than a scintilla of evidence may be sufficient to entitle a defendant to a charge on a lesser offense."  *Cavazos*, 382 S.W.3d at 385; *see also Meru*, 414 S.W.3d at 163.  Further, in determining whether the evidence presented at trial supports an instruction on a lesser offense, a reviewing court may not consider whether the evidence presented was "credible, controverted, or in conflict with other evidence."  *Moore v. State*, 969 S.W.2d 4, 8 (Tex.Crim.App. 1998).

Nonetheless, the evidence supporting an instruction on a lesser offense "must still be directly germane to the lesser-included offense[.]"  *Cavazos*, 382 S.W.3d at 385; *see also Hampton v. State*, 109 S.W.3d 437, 441 (Tex.Crim.App. 2003).  Moreover, this "threshold requires more than mere speculation--it requires affirmative evidence that both raises the lesser-included offense

8

and rebuts or negates an element of the greater offense." *Cavazos*, 382 S.W.3d at 385. It is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser offense for the finder of fact to consider before an instruction on a lesser offense is warranted. *See Skinner v. State*, 956 S.W.2d 532, 543 (Tex.Crim.App. 1997); *see also Cavazos*, 382 S.W.3d at 385; *Hampton*, 109 S.W.3d at 441.

A trial court's refusal to submit a lesser-included offense that was requested and raised by the evidence results in some harm when that failure leaves the jury with the sole option to either convict the defendant of a greater offense or to acquit him. *Saunders v. State*, 913 S.W.2d 564, 571 (Tex.Crim.App. 1995); *Roy v. State*, 09-14-00367-CR, 2017 WL 2380527, at *3 (Tex.App.--Beaumont May 31, 2017, pet. ref'd)(mem. op. not designated for publication); *Brooks v. State*, No. 08-15-00208-CR, 2017 WL 6350260, at *7 (Tex.App.--El Paso Dec. 13, 2017, pet. ref'd)(mem. op., not designated for publication). The defendant is harmed "because the jury was not permitted to fulfill its role as factfinder to resolve the factual dispute whether the defendant committed the greater or lesser offense." *Saunders*, 913 S.W.2d at 571.

### Application

Appellant was charged with murder by "intentionally and knowingly" causing the death of Ochoa, or alternatively, intentionally causing "serious bodily injury," thereby resulting in his death. As a matter of law, manslaughter is a lesser-included offense of murder. *Roy v. State*, 509 S.W.3d 315, 317 (Tex.Crim.App. 2017); *Cavazos,* 382 S.W.3d at 384. As such, the only issue for our consideration is whether there was any evidence presented at trial from which a rational jury could have found Appellant guilty of manslaughter, and not guilty of the greater offense of murder.

Appellant claims he met this burden by eliciting evidence that Bygotia only planned to scare Ochoa, but once the shooting starting, all Appellant did was close his eyes, and discharge his gun into the ground to scare anyone who might shoot at him. Only because of his lack of skill or

9

experience with a gun, did the repeated kick of the gun angle it upwards, perhaps causing one of his bullets to strike Ochoa.  The State responds with a four-pronged attack: (1) the issue is inadequately briefed and thus forfeited; (2) Appellant relied on a self-defense theory that inherently negates manslaughter; (3) Appellant never presented any evidence supporting a jury finding of manslaughter, as distinct from perhaps criminally negligent homicide, and (4) Appellant was guilty as a party for assisting Bygotia.  We reject the inadequate briefing claim.  Further, we need reach only the question of whether Appellant presented any evidence for the mental state for manslaughter to decide this issue.

*Adequacy of Briefing*

In a single paragraph argument, the State claims that Appellant's briefing is inadequate which precludes us from reaching the merits.  The State specifically argues that Appellant "does not cite any authority in his argument, such that his complaint should be rejected on this basis alone."  The Rules of Appellate Procedure provide clear guidelines for the form of an appellant's brief.  TEX.R.APP.P. 38.1.  A reasonable checklist for the appropriate elements of an appellant's brief in a criminal case is set out in *Walder v. State*, 85 S.W.3d 824, 827 (Tex.App.--Waco 2002, no pet.).  Essential in that list are an appropriately stated standard of review, identification of governing legal principles, and the application of those principles to the facts of the case.  *Id*.

Appellant's brief appropriately states the standard of review.  He provides record citations to evidence that he claims negates the murder charge and supports the manslaughter submission.  He applies the law to the facts to argue that a rationale jury could have found him guilty of manslaughter, but not murder.  His brief mainly lacks citation to any case on similar facts that would support his argument.  Yet because these cases are necessarily fact specific, that kind of authority is helpful but not essential to Appellant's claim.  Under the circumstances, we find that the brief substantially complies with TEX.R.APP.P. 38.1 and we will review the merits.

10

*Lack of any evidence for manslaughter*

Murder is statutorily defined as intentionally or knowingly causing the death of another, or alternatively, intentionally or knowingly causing serious bodily injury to another by committing an "act clearly dangerous to human life," resulting in that person's death. TEX.PENAL CODE ANN. § 19.02 (West 2011). A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. TEX.PENAL CODE ANN. § 6.03(a)(West 2011). A person acts knowingly when he is aware of the nature of his conduct and that his conduct is reasonably certain to cause the result. *Id.* at § 6.03(b).

On the other hand, manslaughter requires a finding that the defendant "recklessly cause[d] the death of an individual." TEX.PENAL CODE ANN. § 19.04(a)(West 2011). A person acts recklessly when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. *Id.* at § 6.03(c). By example, manslaughter might include conduct such as: shaking or striking a child so as to cause death, *Ramos v. State*, 407 S.W.3d 265, 267 (Tex.Crim.App. 2013); hogtying a victim who then suffocates, *Ibarra v. State*, 08-05-00207-CR, 2007 WL 2457587, at *7-9 (Tex.App.--El Paso Aug. 30, 2007, no pet.)(not designated for publication); striking a person in the head with a fist, that hours later results in death from hemorrhage, *Milam v. State*, 08-04-00354-CR, 2006 WL 304528, at *2 (Tex.App.--El Paso Feb. 9, 2006, pet. ref'd)(not designated for publication).

Further down the scale of culpability lies criminally negligent homicide, which involves causing the death of another by criminal negligence. TEX.PENAL CODE ANN. § 19.05(a). Criminal negligence involves inattentive risk creation; the actor ought to be aware of the risk surrounding his conduct or the results thereof. *Lugo v. State*, 667 S.W.2d 144, 147-48 (Tex.Crim.App. 1984); *Lewis v. State,* 529 S.W.2d 550, 553 (Tex.Crim.App. 1975); *Todd v. State,* 911 S.W.2d 807, 814-

11

15 (Tex.App.--El Paso 1995, no pet.). Distinguishing the two, recklessness involves conscious risk creation, as opposed to the inattentive risk creation involved in criminal negligence. *Lewis*, 529 S.W.2d at 553. Recklessness requires conscious disregard of the risk created by the actor's conduct, while criminal negligence describes a failure by the actor to perceive the risk. *Id.*

At the outset, we agree that Appellant presented some evidence contesting the requisite mental state for murder. He claimed only to participate in a plan where Bygotia would at most scare Ochoa. Once Bygotia deviated from that plan, Appellant claimed to only fire his gun into the ground to scare off Ochoa or his friend from shooting him. But his statement that he did not intend to kill Ochoa, standing alone, does not raise the issue of manslaughter. As the Court of Criminal Appeals noted in *Godsey v. State,* 719 S.W.2d 578, 584 (Tex.Crim.App. 1986), a statement that a defendant did not intend to kill the victim "cannot be plucked out of the record and examined in a vacuum." Instead, regardless of any statements made by the defendant on the issue of intent, the entire record must still be reviewed to determine if a rational trier of fact could have concluded that the defendant acted recklessly. *Mathis v. State,* 67 S.W.3d 918, 926 (Tex.Crim.App. 2002); *Arnold v. State*, 234 S.W.3d 664, 672 (Tex.App.--Houston [14th Dist.] 2007, no pet.).

Given the statutory definition of manslaughter, the record needed to contain "some affirmative evidence" from which a rational juror could have concluded that Appellant had the lesser mental state required for manslaughter, *i.e.,* that he acted recklessly in conscious disregard of an unjustifiable risk that his conduct would cause the victim's death. *Cavazos,* 382 S.W.3d at 385; *see also Roy v. State*, 509 S.W.3d 315, 317 (Tex.Crim.App. 2017)("Despite knowing the risks associated with drinking alcohol, smoking marihuana, and smoking dip cigarettes while driving, Roy chose to drive that night."). Classically in this type of case, "[e]vidence that a defendant knows a gun is loaded, that he is familiar with guns and their potential for injury, and that he points

12

a gun at another, indicates a person who is aware of a risk created by that conduct and disregards the risk." *Thomas v. State*, 699 S.W.2d 845, 850 (Tex.Crim.App. 1985). We do not find that kind of evidence in the record.

Appellant never testified that he pointed the gun at anyone, nor did he have any particular knowledge of firearms. The only thought process he described was a claim of self-defense, which generally negates the recklessness required for a manslaughter submission. *See, e.g., Shannon v. State*, No. 08-13-00320-CR, 2015 WL 6394922, at *10 (Tex.App.--El Paso Oct. 21, 2015, no pet.)(not designated for publication)(where defendant claimed to swing and hit decedent, after she first swung at him); *Nevarez v. State,* 270 S.W.3d 691, 694-95 (Tex.App.--Amarillo 2008, no pet.)(where defendant in murder trial admitted purposefulness of actions that led to death and argued self-defense); *Martinez v. State*, 16 S.W.3d 845, 848 (Tex.App.--Houston [1st Dist.] 2000, pet. ref'd)(where defendant testified that he acted in self-defense); *Avila v. State,* 954 S.W.2d 830, 843 (Tex.App.--El Paso 1997, pet. ref'd)(defendant's claim that he acted in self-defense precluded an instruction on reckless discharge of a weapon); *Johnson v. State,* 915 S.W.2d 653, 659-60 (Tex.App.--Houston [14th Dist.] 1996, pet. ref'd)(where defendant testified that he acted in self-defense). And indeed, through voir dire, opening, and in his own testimony, Appellant raised the self-defense claim.

A jury may of course infer intent or knowledge from any fact that tends to prove its existence, including the acts, words, conduct of the accused, and the method of committing the offense. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex.Crim.App. 2004). None of Appellant's words, conduct, or method of committing the offense raise a recklessness state of mind. Typically, shooting a person at close range infers an intentional, rather than reckless or negligent intent, even considering the defendant's testimony that he did not intend to kill his victim. *See, e.g., Cavazos*, 382 S.W.3d at 385 (where evidence revealed that the defendant pointed a loaded gun at his victim,

13

pulled the trigger twice, and then fled the scene, no rational jury could have concluded that his conduct was merely reckless, despite the defendant's testimony that he did not intend to kill his victim); *Mathis*, 67 S.W.3d at 926 (where evidence revealed that the defendant walked into an apartment and fired a high-powered rifle at three separate victims, no rational juror could have concluded that defendant was guilty only of manslaughter and not murder, despite the defendant's claim that his conduct was not intentional); *Forest v. State*, 989 S.W.2d 365, 368 (Tex.Crim.App. 1999)(defendant's act of shooting a victim in the buttocks was "clearly dangerous to human life," and defendant's testimony that he did not intend to kill his victim was insufficient to warrant an instruction on the lesser-included offense of manslaughter).

Appellant and Sandoval testified that Appellant was shooting at the ground. That testimony, along with Appellant's claim that he closed his eyes and was inexperienced with firearms, might suggest that he failed to perceive the risk of discharging a firearm near a group of people. That evidence might support some argument for criminally negligent homicide, which does not require the conscious disregarding a risk. *Todd,* 911 S.W.2d at 814-15 (at the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct; the key to criminal negligence is found in the failure of the actor to perceive the risk). Yet Appellant did not seek an instruction on criminally negligent homicide. And evidence that might support a criminal negligence charge does not support a manslaughter charge. *See Montoya v. State*, 744 S.W.2d 15, 28 (Tex.Crim.App. 1987), *overruled on other grounds by Cockrell v. State*, 933 S.W.2d 73 (Tex.Crim.App. 1996)(gun that discharged while defendant attempted to throw it away did not raise issue of manslaughter, but only criminally negligent homicide); *Hunter v. State*, 647 S.W.2d 657, 659 (Tex.Crim.App. 1983)(gun discharged when defendant slung his arm behind him while driving).

Because the record would not support a rationale jury finding recklessness as required for manslaughter, we overrule Issue One.

## VIOLATION OF "THE RULE"

The trial court concluded that several detectives violated the witness sequestration rule during the trial. Appellant's second issue claims that the trial court erred in failing to strike testimony, and in not granting his motion for mistrial based on that violation.

### Basis of the Complaint

The State called Detective Hector Loya as its second witness. His testimony focused on the initial hours of the investigation, including his confirmation that Ochoa expired, the arrest of Armando Torres, and the arrest the next morning of Appellant. The State proved up Appellant's confessional interview through Detective Loya, and most of his testimony focused on the circumstances of the interview, including whether Appellant knowingly and voluntarily waived his right against self-incrimination. At the conclusion of his testimony, even though he was released from his subpoena, the trial court instructed Detective Loya "not to discuss this case or your testimony with other witnesses or anyone else except the attorneys." He was further admonished "not to read any report of or comment on the testimony or evidence in the case." He was warned that any violation of the rule subjected him to being held in contempt, and he acknowledged understanding that instruction.

The State later called Officer Devika Foster who collected evidence at the crime scene. She identified seven .380 and five 9mm shell casings found at the scene. On cross-examination, she was asked, and initially agreed, that three unspent .380 rounds were also found at the scene.[4]

---

[4] On cross examination:
> [DEFENSE COUNSEL]: Now, there were also three full rounds of .380 calibers that were not spent that were found. Correct?
> [FOSTER]: I believe so.
> [DEFENSE COUNSEL]: Okay. Those are not entered into evidence though. Correct?
> [FOSTER]: No.

She later attempted to correct that testimony to state that three unspent 9mm rounds were found.[5] (5RR205) Appellant's counsel attempted to impeach Foster with a supplemental report prepared by Detective Loya that stated the police had found a total of ten .380 rounds, spent and unspent at the scene. She would not verify the detective's statement, and testified that "you would have to ask him." Appellant attempted to do just that by recalling Detective Loya in his case to elicit that statement from the report.

When recalled, however, Detective Loya recanted the statement in his supplement that three live rounds of .380 ammunition were found at the scene. He recanted his supplemental report after reviewing Officer Foster's report. He apparently reviewed her report during the trial:

> [DEFENSE COUNSEL]: Okay. So you've included that in your supplement of November 13, 2014, and that was incorrect?
>
> [LOYA]: That is correct. It's incorrect.
>
> [DEFENSE COUNSEL]: All right. Now, you reviewed Officer Foster's report just recently?
>
> [LOYA]: Yes.
>
> [DEFENSE COUNSEL]: Okay. After she had testified?
>
> [LOYA]: I don't know if she has or hasn't testified.
>
> [DEFENSE COUNSEL]: Okay. "Recently" meaning within the past day or two?
>
> [LOYA]: Yes.

---

[5] Foster then tried to correct herself:

> [DEFENSE COUNSEL]: Okay. And you also testified earlier that there was also three full rounds of .380 calibers that had not been spent that were found. Correct?
> [FOSTER]: No, nine millimeter rounds.
> [DEFENSE COUNSEL]: No, .380 rounds that had not been entered into evidence?
> [FOSTER]: I don't remember.
> [DEFENSE COUNSEL]: Okay.
> [FOSTER]: I know it's not on this sheet.
> [DEFENSE COUNSEL]: Right. And I had asked you that also at the crime scene there was three .380 rounds that were found and you had answered yes. Do you recall that?
> [FOSTER]: Yes.
> [DEFENSE COUNSEL]: All right. So -- and those have not been entered into evidence. We don't see those there. Correct?
> [FOSTER]: No, they're not on the sheet.

[DEFENSE COUNSEL]: Okay. At the request of the district attorney's office?

[LOYA]: Actually, there in our office the detectives that are working this case, they were talking about it and we were all reviewing it.

[DEFENSE COUNSEL]: Okay. Which detectives were discussing it?

[LOYA]: Detective Posada and Detective Lara.

[DEFENSE COUNSEL]: All right. And detective -- this is Detective Mike Lara?

[LOYA]: Yes. Uh-huh.

Detective Mike Lara had also testified in the trial, and he was also admonished not to discuss the case with anyone. Appellant's counsel was able to develop in cross-examination before the jury that Detective Loya violated the court's instructions not to discuss the case and not to review any reports.

### Standard of Review and Applicable law

"The Rule is designed to prevent witnesses from altering their testimony, consciously or not, based on other witnesses' testimony." *Routier v. State*, 112 S.W.3d 554, 590 (Tex.Crim.App. 2003), *citing Webb v. State*, 766 S.W.2d 236, 239 (Tex.Crim.App. 1989). The issue typically arises when a litigant claims that a trial court erred in either (1) excluding a witness, or (2) allowing a witness to testify when they have been found to have violated the rule. *Id.* The Texas Court of Criminal Appeals has articulated a two-part test for addressing these type claims. *Id.* Appellant, however, never sought the exclusion of any witness below, but rather sought a mistrial.

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Archie v. State*, 221 S.W.3d 695, 699-700 (Tex.Crim.App. 2007); *Salazar v. State*, 38 S.W.3d 141, 148 (Tex.Crim.App. 2001). We uphold a trial court's ruling if it is within the zone of reasonable disagreement. *Archie*, 221 S.W.3d at 699, *citing Wead v. State*, 129 S.W.3d 126, 129 (Tex.Crim.App. 2004). "Generally, a mistrial is only required when the improper evidence is 'clearly calculated to inflame the minds of the jury and is of such a character as to suggest the

17

impossibility of withdrawing the impression produced on the minds of the jury.'" *Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex.Crim.App. 1999), *citing Hernandez v. State*, 805 S.W.2d 409, 414 (Tex.Crim.App. 1990). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex.Crim.App. 2004); *Freeman v. State*, 340 S.W.3d 717, 727-28 (Tex.Crim.App. 2011), *cert. denied*, 565 U.S. 1161 (2012); *Archie*, 221 S.W.3d at 699-700. Otherwise, where the prejudice is curable, an instruction by the court to disregard eliminates the need for a mistrial. *Young v. State*, 137 S.W.3d 65, 69 (Tex.Crim.App. 2004). As regards a violation of "the rule," a trial court has broad discretion to determine whether a violation harms the defendant, and a reviewing court will not disturb its ruling absent a clear abuse of discretion. *Beets v. State*, 767 S.W.2d 711, 747 (Tex.Crim.App. 1987), *cert. denied,* 492 U.S. 912, 109 S.Ct. 3272, 106 L.Ed.2d 579 (1989); *White v. State*, 867 S.W.2d 921, 927 (Tex.App.--Houston [1st Dist.] 1993, no pet.).

### **Application**

Appellant's second issue complains in part that trial court erred in not striking Detective Loya's testimony. We reject that claim because Appellant never made that specific request below. After Detective Loya testified that several of the detective witnesses had met and discussed the case, Appellant's counsel asked for a mistrial. His counsel based that motion on the lack of "full discovery." The trial court acknowledged that striking testimony was a potential remedy available to it, but for time being, the trial court denied the motion for mistrial. Instead, it recessed the trial for several days to allow Appellant to investigate whether the State possesses an additional evidence that had not been produced, or there were other corrections that needed to be made to Detective Loya's reports.

The trial court held a hearing the next day to further address the issue. The three detectives were present for the hearing, but none were called to testify about their meeting, or what

18

specifically they had discussed. The trial court presented a draft order that declined to hold the Detective Loya in contempt, or grant a mistrial, but alluded to the recess in the trial. Appellant repeated his request for a mistrial, and did not ask for any other specific relief. We therefore decline to hold that the trial court abused its discretion in denying relief that was never requested. As a fundamental tenet of error preservation, the complaint on appeal must mirror the complaint at trial. *Lovill v. State*, 319 S.W.3d 687, 691 (Tex.Crim.App. 2009)("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."). Moreover, a "party must have informed the trial judge *what was wanted* and why the party was entitled to it." [Emphasis added]. *Id*. We therefore overrule Appellant's second issue as it pertains to striking testimony.

Nor did the trial court abuse its discretion in overruling Appellant's motion for mistrial. The State urges that the trial court erred in concluding that any of its witnesses violated the witness sequestration rule. We need not reach that issue, because even assuming there was a violation, on this record a mistrial was not warranted. We arrive at that conclusion for several reasons. First, Detective Loya was principally called by the State to prove up Appellant's confession. The State never called him to testify about the evidence found at the crime scene, because simply put, Detective Loya was never at the crime scene. But the record at most suggests that Detective Loya participated in a discussion, and reviewed a report, germane to whether 9mm or .380 unspent rounds were found at the scene. And his testimony only addressed that issue because Appellant attempted to use one of Detective Loya's supplemental reports to impeach another State witness. Yet it seems evident that Detective Loya had no first-hand knowledge of the claim made in his report, and Appellant was accorded additional time to investigate why his report read as it did.[6]

---

[6] Even at that, the claim that there might have been three unspent .380 rounds seems implausible on its face. The .380 Bersa could hold seven rounds in the clip, and one in the chamber. The police recovered seven spent .380 shell casings at the scene that it linked to the .380 Bersa. If there were three unspent .380 rounds, they would have needed to come

19

Appellant was able to impeach Detective Loya before the jury for failing to follow the trial court's instructions not to discuss the case. Appellant sought no other relief short of a mistrial. Here, failing to seek the lesser remedy of an appropriate instruction is fatal to his claim. The Court of Criminal Appeals addressed an analogous issue in *Lee v. State*, 549 S.W.3d 138 (Tex.Crim.App. 2018). In that case, the State intended to prove the defendant was driving while intoxicated based on (1) the defendant's loss of normal mental or physical faculties, and (2) having a blood alcohol level greater than the statutorily prescribed level. *Id*. at 139. The State's attorney had alluded to the BAC level and a blood test in voir dire and in opening statements. *Id*. Almost half the trial was devoted to testimony over the blood sample. *Id*. The trial court, however, excluded any testimony about the actual test result when it came to light that the State could not establish a proper chain of custody for the blood sample. *Id*. at 142. The defendant then moved for a mistrial, declining to ask for an instruction that the jury ignore the multiple references to the BAC test. *Id*. The trial court denied the motion for mistrial, but the court of appeals reversed the conviction on the sole point that a mistrial should have been granted. *Id*.

The Texas Court of Criminal Appeals, however, concluded that failing to ask for a curative instruction in that case was fatal to the claim. "We agree that if a curative instruction would have sufficed, it cannot be said that the trial court abused its discretion to deny Appellant's final mistrial request." *Id.* at 145, *citing Ocon v. State*, 284 S.W.3d 880, 885 (Tex.Crim.App. 2009)("Though requesting lesser remedies is not a prerequisite to a motion for mistrial, when the movant does not request a lesser remedy, we will not reverse the court's judgment if the problem could have been cured by the less drastic alternative."). In *Lee*, the curative instruction presumably would have told the jury ignore a substantial amount of evidence and argument that they had already heard. In this case, an instruction could have been much narrower, such as telling the jury to set aside

_____

from another .380 pistol, but no witness ever testified to a third person actually having or firing a gun at the scene.

20

Detective Loya's recanting of his supplemental report. Instead, Appellant sought only a mistrial. Because that remedy is reserved for "extreme circumstances, where the prejudice is incurable," we decline to hold the trial court abused its discretion in failing to grant a mistrial. *See Hawkins*, 135 S.W.3d at 77.

Issue One and Two are overruled and the judgment of conviction is affirmed.


September 28, 2018

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)