

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00775-CR

Manuel Michael **GARCIA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 399th Judicial District Court, Bexar County, Texas
Trial Court No. 2015CR5412
Honorable Frank J. Castro, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                 Patricia O. Alvarez, Justice
                 Liza A. Rodriguez, Justice

Delivered and Filed: January 20, 2021

AFFIRMED

Manuel Michael Garcia was convicted of capital murder and sentenced to life imprisonment without parole. On appeal, he argues the trial court erred in denying his motion for mistrial during the re-direct examination of a State's witness. We affirm.

### BACKGROUND

On February 18, 2015, Garcia hit several people at several different locations with the vehicle he was driving, causing injuries to multiple people and two deaths. The State charged him

with capital murder, alleging that he intentionally hit the complainants with the vehicle he was driving.

At trial, Cynthia Ann Cavazos testified that on February 18, 2015, Garcia, an acquaintance, asked if she could give him a ride to the east side of San Antonio as she was already headed that direction for work. She agreed. When they arrived on the east side of town, sometime after 5:00 p.m., Garcia was unable to direct her to where he needed to go. Frustrated, Cavazos told him that she needed to get to work and had to drop him off. According to Cavazos, Garcia said to drop him off at the next bus stop. However, when they arrived at the bus stop, Garcia told her, "Not this one—the next one." Cavazos reiterated that she really had to get to work. When they arrived at the next bus stop, Garcia reached under the passenger seat and pulled out a glass bottle. While threatening Cavazos with the bottle, Garcia ordered Cavazos out of the car. Cavazos testified that she was afraid and complied with his order. Garcia then drove off. Because she did not have a cell phone, Cavazos had to walk multiple blocks to the nearest store. Twenty to thirty minutes later when she finally reached a convenience store, she called her husband and told him to call his father because title to the car was under his father's name. She then called 9-1-1.

James Allen, VIA bus driver, testified that on February 18, 2015, at about 5:00 p.m., he was driving a VIA bus route on the east side of San Antonio. Because he was ahead of schedule, he pulled over at a bus stop "to let some time go by." He was talking with some of the passengers when he heard the noise of tires peeling and the bottom of a car hitting a curb. Allen looked up and saw a car going east on Iowa Street, attempting to turn on Dreiss Street. Allen testified he saw the driver of the car run over a gentleman standing on the corner:

> I thought he was going to run into the telephone pole, but he managed to stop. He backed up. And I told the people on the bus, I said, "Watch this guy; I think something is going to happen." And he turned around and he veered to the left, and then he came back and went straight and went across the curb to his right. And there was a gentleman standing there and he ran him over in his car. [He] came back to

his left on Iowa Street, turned around, and went back and veered back to his left, ran over—well, he hit the gentleman. He didn't run over him at the time. He hit him and knocked him out into North Pine Street where he ran over him again and he proceeded north on Pine and that was the last I saw of him.

Allen testified, "I was horrified. I just couldn't believe that somebody would just run over somebody for no apparent reason and then come back and do it again." When asked if it appeared the driver had lost control of his vehicle, Allen replied, "No." "It was too steady. His movements were deliberate, appeared to be deliberate."

Allen clarified that he looked up after he heard the car go onto the sidewalk in the grassy area of the street corner. He did not notice the gentleman on the sidewalk immediately because he was paying attention to the car. He then noticed the gentleman walking "like he was fearful." "He was weak in the knees . . . [and] could barely stand up." Allen testified when the car turned around and came back, the gentleman "dodged behind the telephone pole, almost like he was running."

Video footage from Allen's VIA bus was entered in evidence. Video from different vantage points inside and outside the bus show the car Garcia was driving at a high speed travel across the sidewalk and grassy area of the corner. Although the first collision between Garcia's car and the victim cannot be seen, the passengers in the bus are heard reacting to it. After Garcia's car turned onto the road, video footage from the rear of the bus shows Garcia's car leaving at a high rate of speed when it suddenly stopped and turned around. It then approached the back of the bus at a high rate of speed when it veered left across the oncoming lane of traffic and went directly to the same corner where the victim had been standing. The video does not show the car running over the victim, but it does show the passengers' reactions to the horrific event, with many of them shouting, "He ran over him again!"

Melissa Guerra testified that on February 18, 2015, at about 5:45 p.m., she was pulling up to the stop sign at the corner of Pine and Chavez Streets when she saw a gentleman on her left-

hand side. She testified he was in an empty parking lot and was stumbling. She then saw a gray car (the one Garcia was driving) jump the curb, hit the gentleman, and drag him on the street. The car then continued up the street at a high rate of speed. Guerra clarified that she did not see the first time the car struck the gentleman. According to Guerra, it appeared the driver of the gray car was targeting the gentleman.

Richard Ramirez testified that on February 18, 2015, he was living with his mother at Dakota and Pine Streets. He was standing at the corner when he heard a car coming at a high rate of speed:

> I turn around and I see a car coming and it just went past the stop sign. . . . I just— you know, in my mind somebody probably driving drunk or whatever. . . . But I looked down the street and I [saw]—I don't know his name, but he was coming up the street like this with his bike. . . . No, he was actually walking the bike because it's a little steep hill, so probably—he was probably tired or something. But he passes by my mom's basically every day, say "Hey, good afternoon." You know what I'm saying? . . . I heard a noise, and I turn around. I see a car leaving off the grassy area right here. . . . And so I see a lady standing in the middle of the street, she's like, "Over there, over there," you know, "Somebody got ran over, over there." But she couldn't speak English. So I walked over, "What? What are you talking about?" So I walked over and that's when I s[aw] she's pointing that direction. That's when I s[aw] the person in the grass, basically almost in the middle of the grass. . . . He was—well, when I got to him, you know, other people came out and they were trying to like move the bike off of him or something. And, "No, no, don't touch him. Don't touch him. He might be injured, broken back or something. Don't touch him." But he was still moaning and in pain.

Ramirez then called 9-1-1. His 9-1-1 call was introduced in evidence.

The pedestrian who was hit by Garcia twice was identified as Patrick Moore. The gentleman who was walking his bicycle was identified as Samuel White. Both men died from their injuries.

Rino Leos testified that on Feb. 18, 2015, he was at his sister's home on Nevada Street in San Antonio. He was walking to the store with his girlfriend, Caroline Rose Garcia, on a sidewalk. Holding hands, they were a few steps from the corner when they heard a car speeding. Leos

testified that when he turned around and saw the car coming at them, he pushed his girlfriend out of the way. She was struck by the car's mirror and flipped. Her calf was "pinched" between the car's tire and the high curb. Leos testified that "everything just went dark" and when he came to, he was on the hood of the car as it was speeding down the street. Leos testified,

> I remember seeing the guy. He was laughing until I like tried getting up. I put my hand on the hood. I was [lying] down on my side looking through the windshield and he was laughing until I started picking myself up. And I just remember him yelling like—I couldn't hear nothing [sic]. Honestly, I couldn't hear nothing [sic], but he started yelling and then I figured he was going to try something else, so my first reaction was just throw myself off. . . . I ended up about right here, right here, and my–my body ended up like halfway underneath the parked car. . . . I remember getting up. Well, I had like kind of knocked out and when I got up, I tried getting up and my back hit the car and my legs and like half my waist was halfway underneath the car, so when I tried getting up I hit the car. So I had to crawl out. I tried getting up and I couldn't and I fell. . . . Then I saw my girlfriend and she was yelling. And that like kind of got me like freaked out, so my adrenaline started pumping and then I was capable of getting up. I ran and we met up. And she was— she was just freaking out, so I told her let's sit down. And the guy in the corner, the corner house came out and he—he told us what happened. And we told him we just got hit by a car. . . . We heard the tires screeching again coming back and the guy told us, "He's coming back, he's coming back, run in my house." Like run for safety. So that's what we did. I couldn't get up, so she started dragging me and I like—my adrenaline started pumping again and I got up, stumbling but I mean I made it inside. . . . So we were right here and the car was coming down from this way and the car was coming down, back down Pine Street towards Nevada. . . . And the minute we got on the porch, the guy from the house was on the corner looking and he like—he turned and jumped on the curb and tried hitting that guy and he had to jump out [of] the way himself.

Leos testified as a result of being hit by Garcia's car, his broke his left ankle, which had to be repaired with the placement of two screws. His right ankle had a hairline fracture "all the way around."

Leos's girlfriend, Caroline Garcia, testified she and Leos were walking on the sidewalk on their way to the store when they got hit by a car. Caroline Garcia testified they were by a house when they heard the screeching of tires. By the time they turned around, the car had hit the curb and "jumped on the sidewalk," striking her. She "was hit by the mirror on the back of [her] neck

and the lower part of [her] head." Caroline Garcia testified, "I believe I like flipped or tumbled and somehow then my right calf got ran over or smooshed. I'm not too sure what happened." She remembered rolling and when she stopped, the car was gone. She screamed for Leos, and when she saw him, they ran to each other. They just had sat down on the curb when they heard the screeching again. Caroline Garcia testified they looked at each other realizing the driver was coming back: "So I had to pick Rino [Leos] up to make him like get up, 'Let's go, we got to go, we got to go!'" Leos told her he could not go because of his ankle. Caroline told him, "We got to, we got to go. You need to go." She testified she started dragging him when he was able to get up. The owner of a nearby house asked if they were okay. They replied that the driver had hit them and was coming back. Caroline Garcia testified,

> So I ran into like their porch and they had a gate locked, and I was so nervous and had so much anxiety I couldn't open the gate. There was a latch or something and I just couldn't do it, couldn't do it. And Rino [Leos] did it, so we ran in. There was a lady right there and was like, "What's going on? I have kids." I was like, "I'm sorry, let us in, there's this car and he's trying to hit us." The gentleman told her, "Let them in, let them in." So, she let us in. And by the time we turned around to look outside he was already on their grass, on the curb so their grass was getting off, like around the stop sign and the grass getting back off on to the road.

Caroline Garcia testified that "[i]t wasn't an accident." "It was on purpose. He jumped the curb on purpose. He didn't lose control." As a result of being hit by Garcia's car, she tore a ligament in her neck and has nerve damage to her calf.

Eduardo Cisneros testified that on February 18, 2015, he was nineteen years old and living on Dakota Street in San Antonio. He and his two younger brothers were playing basketball in the street. Their moveable basketball hoop was on the sidewalk. They heard tires screeching and saw a speeding car. They moved to the sidewalk. Cisneros testified, once the car turned the corner, it "turned straight to hit [his] little brothers," almost hitting them. The car "landed . . . behind the [basketball hoop] and . . . kind of got stuck." The driver of the car then reversed and attempted to

hit Cisneros. Cisneros testified, "He tried to back up fast and hit me. I ran back to my yard. By the time I had my mom call the cops, he already took off."

Zachary O. testified that on February 18, 2015, he was thirteen years of age when he saw a car "cut diagonally across the field":

> There was a lady there, and he hit her and then went like this. And I went inside to go tell my mom. It did not look like an accident. He could have just stopped and turned normally but he drove across and hit the lady across the field. She wasn't paying attention. She was just walking when she got hit. She was on the ground and everybody heard it. They went outside and went to go see if she was okay. She did not get up.

The woman who was struck, Charlene Flowers Jones, was later hospitalized with serious injuries. She survived.

Mario Abalos testified that on February 18, 2015, he was walking through an empty lot on Commerce Street when he noticed a gray car:

> He was driving slow at first and then pulled into the parking lot toward me really fast. He hit me once and I got up. I was like what the hell. And then he backed up and hit me a second time. And then I basically was all nervous, getting up and running. And at that point, if I remember, I ran I don't know how many meters and I collapsed in front of this restaurant. I know he came at me a third time, but he didn't hit me that third time.

When asked how he wasn't hit the third time, Abalos replied, "I don't know. I mean, I was from here to the door, so I guess there wasn't enough room to get me. I wasn't thinking about that. I was thinking about surviving."

Rene Guerrero testified that on February 18, 2015, he was driving on Commerce Street when a gray car got in front of him. Guerrero testified,

> And at first he was driving normal until he jumped in front of me and all of a sudden he went to the oncoming traffic and went on to the burger place and just hit somebody. . . . I was freaked out. I was—couldn't believe I saw it, you know.

Guerrero testified it did not look like the car had lost control "[b]ecause he was just driving, and all of a sudden, he just turned to one side [a]nd when he was done hitting the dude, he just went

back to the lane, the right lane." Guerrero tried to follow the car down Commerce Street, but the car was going very fast. Guerrero then saw the car go through a red light at full speed and hit another vehicle. After the crash, Guerrero saw the man climbing out of the window of the gray car and run down train tracks. Guerrero and another man gave chase. Guerrero testified he helped tackle Garcia. Guerrero identified Garcia in court as the same person he tackled.

A video from a VIA bus was introduced in evidence. The video shows a gray car turn from a side street and follow the bus. The gray car then veers left, travels across the oncoming lane of traffic, and jumps up a sidewalk right in front of a restaurant. The car then veers from the sidewalk back across the oncoming lane of traffic to the right lane of traffic, passing the bus. As with the other VIA bus video, the driver's actions in the video appear to be deliberate.

Darret Bard testified that on February 18, 2015, he was driving south down Cherry Street. He drove through a green light at the intersection of Cherry and Commerce Streets when a car crashed into him on his left side. Bard testified, "I kind of saw it out of my peripheral as soon as —as soon as I was at the light, so as soon as the light turned green I could kind of see the car on its way." Bard estimated the car was traveling at about eighty miles per hour in a thirty-five mile per hour speed zone. The car crashed into him, flew up in the air, and landed on a fire hydrant in the parking lot across the road. Bard then saw a man jump out of the gray car and start running away. Bard gave chase. The man started to run on the train tracks near Commerce Street. Bard testified,

> I was chasing him and he said he had a gun. And I kind of ran to—kind of jogged over for cover. And he started to look for something on the ground, so I figured he didn't have a gun. He grabbed a pole. . . . I ran towards him and told him I was going to take the pole. He dropped it and started running. . . . He came out here, somewhere right here underneath the freeway. And we're walking towards traffic, so in the middle lane, the traffic is coming toward us. . . . I was about to turn around, just let cops catch him, and he looked like he was reaching for a door knob of a car in traffic, so I kind of ran towards him and grabbed him and took him down.

Other men helped Bard hold Garcia down. The police then arrived to arrest Garcia. According to Bard, Garcia was coherent.

A crack pipe was found in the car Garcia was driving. Cavazos testified that the crack pipe was not hers.

Sergeant Jesse Izaguirre testified at trial that on February 18, 2020, he was assigned to the Crime Scene Unit. At 6:19 p.m., he was dispatched to South Pine and Iowa Streets. EMS was already at the scene. When he exited his vehicle, one of the first things he noticed was a pair of sunglasses on the sidewalk where the victim had been struck by a car. There was also a cellphone case, a cell phone, some broken glasses, blood, and a glove. Sergeant Izaguirre saw tire marks leaving the road and going up on the curb on the interior of where the stop sign was located. He then went to another crime scene, off of Commerce Street in front of a burger restaurant. He then went to a third crime scene on South Olive Street.

In addition to the VIA bus videos, 9-1-1 calls from multiple persons reporting multiple incidents of pedestrians being struck or almost struck by a gray car on February 18, 2015 were introduced in evidence. The evidence at trial reflected that at the corner of South Pine and Iowa Street, a gray car driven by Garcia hit pedestrian Patrick Moore as it turned the corner. After proceeding down the street, Garcia made a u-turn in his vehicle, crossed the on-coming lane of traffic and ran over Patrick Moore, killing him. Garcia continued to the intersection of South Pine and Nevada Street where he came across Rino Leos and Caroline Garcia. Garcia struck both of them, causing serious injuries. As he did when he struck Patrick Moore, Garcia turned his car around and tried to hit both Rino Leos and Caroline Garcia again. They were able to escape into a nearby home. Garcia then proceeded to 908 Dakota Street where he saw Eduardo Cisneros and his younger brothers playing basketball in the street. Hearing Garcia's car approaching, the three teenagers went to the sidewalk where Garcia drove up on the sidewalk, hitting the basketball hoop

and almost hitting the three teenagers. The record reflects that Garcia then reversed his car quickly, trying to hit Eduardo Cisneros who had run into the middle of the street to get away from the car. Eduardo Cisneros and his brothers were able to get into their home where their mother called the police. There was evidence at trial that Garcia then proceeded to Spruce Street and Dakota where he hit and killed Samuel White riding his bicycle. Garcia then drove to 300 South Olive Street where he saw a woman, Charlene Flowers Jones, in a field. As she was walking in the field, she was run over by Garcia's car. Jones was later hospitalized with serious injuries. Garcia then proceeded down Commerce Street where he struck Mario Abalos twice and attempted to hit him a third time. Garcia then proceeded at a high rate of speed on Commerce Street where he ran a red light and collided with another vehicle.

## DISCUSSION

At trial, a main point of contention was whether Garcia had acted intentionally. In an effort to prove Garcia's intent, the State called Detective Daniel Karako, an officer with the San Antonio Police Department's driving-while-intoxicated unit. Detective Karako explained that after Garcia was arrested and transported to a detention center, Detective Karako evaluated him for signs of intoxication. The State asked Detective Karako a series of questions intended to establish that, even if a person is intoxicated, he can still act with the requisite intent for capital murder. The State also established through questioning that at the time Detective Karako evaluated Garcia for signs of intoxication, he did not know Garcia's mental state when the complainants were killed.

On cross-examination, defense counsel asked Detective Karako about Garcia's behavior and statements Garcia made about drugs he had ingested. Detective Karako testified that he believed Garcia was intoxicated on the night in question and could not have safely operated a motor vehicle. On re-direct examination, the State asked a series of questions designed to establish

that Garcia voluntarily took intoxicating drugs and that his actions were intentional. The State continued its re-direct examination of Detective Karako:

Q:     I'm going to show you what has been previously admitted as State's Exhibit 13.

                        (Video playing.)

Q:     And I want you to watch this silver car. When that defendant, when that car jumps the curb in order to try to hit that man—

        Defense:     I am going to object to leading, Your Honor.

        Court:       Sustained.

Q:     Did it look like it was intentional[] or reckless when the defendant's car jumps that curb and tried to hit that?

        Defense:     I am going to object to leading, Your Honor, number one, lack of personal knowledge, speculation, and invades the realm of the jury, Your Honor.

        Court:       Okay. Sustained.

Q:     When you talked to the defendant, did he repeatedly tell you when you asked him questions to talk to his lawyer about that?

        Defense:     I am going to object, Your Honor. May we approach?

        Court:       Yes.

                        (At the bench, on the record.)

        Defense:     The objection, and this is a strong one, Judge, it is absolutely impermissible to bring up the fact that a person exercised—

        Court:       Let me have the jury step out real quick.

                    (Open court, defendant present, no jury.)

        Court:       Go ahead.

        Defense:     Judge, the objection to the prosecutor's most recent comment or statement that requests a witness to testify that a criminal defendant requested the right that he has under the Constitution, it's impermissible for the prosecutor to bring that before the jury. It's just like commenting on a defendant's failure to testify. That is a

- 11 -

right he has. And that is the reason it is not to be commented on. A person has a right to a lawyer upon constitutional right and for the prosecutor to comment on that right is improper.

State: Judge, number one, that's not what he said. He did not say I don't want to talk to you, I want a lawyer. What he said was when the detective asked him questions, he said, "Talk to my lawyer about that." Number one, it's not invoking his right. Number two, what it's doing is it is showing that when asked questions that show his guilt, he's saying "I don't want to answer that, you can talk to my lawyer about that."

Court: Well, but I think in the beginning, I didn't watch the whole video, that's what I was going to ask you later, too, in one of the videos he says I want a lawyer right when they are reading his rights. I know you have seen the video and before you told the defense counsel be careful about that video because if it comes in he's asking—you are even cognizant of not bringing that up unless it was going to be the optional completeness because he mentioned, you know, I want to talk to my lawyer. So I don't know where this comes in the video later, but it it's after the fact, he's already mentioned it once. I'm going to sustain the objection. You're getting into a fine line on that too. Be careful on that, State.

Defense: We're probably going to ask the Court to instruct the jury to disregard and move for a mistrial.

Court: I'll grant an instruction to disregard that last question by the prosecutor. I don't think the witness answered it at all. I am going to deny the mistrial. Is there anything that needs to be taken up outside the presence of the jury at this time with this witness or is that cross?

Defense: Cross.

(Open court, defendant and jury present.)

Court: We're back on the record. The jury is present. I am going to go ahead and instruct jury to disregard that last question by the prosecutor regarding asking this witness if the defendant told [him] to answer questions to his attorney or asked him questions, to talk to his lawyer about that. You are going to disregard that and not to consider it for any reason.

"Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). We review the trial

court's denial of a motion for mistrial for abuse of discretion, upholding the trial court's ruling if it fell within the zone of reasonable disagreement. *Id*. When measuring abuse of discretion in failing to grant a mistrial, the court of criminal appeals has adopted a three-factor approach, which balances (1) the severity of the misconduct (i.e., the prejudicial effect), (2) curative measures, and (3) the certainty of the punishment (i.e., the likelihood of the conviction absent the misconduct). *Lee v. State*, 549 S.W.3d 138, 145 n.8 (Tex. Crim. App. 2018).

In applying these factors, we note that the prosecutor's question, although improper, was uttered once, not answered, and appeared to be an attempt to elicit evidence relating to Garcia's intent at the time of the crime. The trial court quickly instructed the jury to disregard the prosecutor's question. "Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer . . . ." *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). Here, the witness did not answer the improper question. Finally, the evidence of Garcia's guilt presented in this trial, which included eyewitness, video, and circumstantial evidence, was overwhelming. Therefore, in applying the three factors to this record, we hold the trial court did not abuse its discretion in denying Garcia's motion for mistrial.

## CONCLUSION

Having overruled Garcia's sole issue on appeal, we affirm the judgment of the trial court.

Liza A. Rodriguez, Justice

Do not publish